UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MOTOR-SERVICES HUGO STAMP, INC.,

Plaintiff,

vs.                                                      Case No.  8:03-cv-703-MSS

M/V REGAL EMPRESS, et al.,

Defendants.

_____/

## ORDER

This cause comes on for consideration upon the filing of Memorandum of Authorities in

Support of Preferred Maritime Lien Status of the Crew's Termination or Severance Wages (Dkt.

526), Lienors' Memorandum of Law in Response to Memorandum of Authorities in Support of

Preferred Maritime Lien Status of the Crew's Termination or Severance Wages (Dkt. 532) and

Lienors' Motion to Strike Notice of Filing Supplemental Authority (Dkt. 548). Following partial

settlement, the present issue of whether the Crew's claims for termination pay are entitled to

preferred maritime lien status as well as Maritime Telecommunications Network, Inc.'s Motion to

Stay Distribution of Proceeds (Dkt. 458) are the only two issues outstanding in the case *sub judice*.

## I.     BACKGROUND

Title 46 U.S.C. § 31301(5) provides that a "preferred maritime lien" is, in part, a maritime

lien on a vessel for "wages of the crew of the vessel." The parties agree that the Crew's collective

claim for termination or severance pay equals $200,796.90. The Crew argue that they are entitled

to a preferred maritime lien for the termination or severance payments owed to them because these

payments constitute "wages of the crew of the vessel" and the courts are required to jealously guard these wages. The Lienors respond that the payments sought by the Crew for termination or severance are not wage claims but, rather, claims for either liquidated damages or penalty claims for early termination. Further, Lienors argue that only wage claims that accrue pre-arrest are entitled to preferred lien status and, since the Crew's claims accrued post-arrest, the Crew does not have a preferred maritime lien for termination or severance pay.

The parties have not spent a significant amount of time in their respective memoranda outlining the facts of the underlying dispute or citing to the applicable language contained in the employment contracts at issue. The Lienors' memorandum states that the collective Crew were employed by three different employers, Imperial Ocean Services, Ltd. ("IOS"), Regal Enterprises, Inc., and Regal Cruises, Ltd., and the claims for termination or severance are based on four separate employment contracts. Accordingly, the Court ordered the Crew to file a sample copy of each of the four distinct contracts providing for termination or severance pay. (Dkt. 534).

A.      The Sample Contract for the Philippines Overseas Employment Administration

The sample contract of employment required by the Philippines Overseas Employment Administration, and apparently used for every employee from the Philippines, provides for a 10 month contract duration[1]. The contract provides for a basic monthly salary of $600.00 for 48 hours of work performed each week, $180.00 in overtime pay ($3.60 per hour) and vacation leave with pay in the amount of $60.00 (3 days) per month. Section 19, the Repatriation provision of the contract, provides:

---

[1] The Court notes that the sample contract filed with the Court appears to be missing pages 2, 4, and 6 of the Annex. (See Dkt. 537). The page containing the applicable notice provision, however, was provided to the Court and the Lienors have not raised any objections with respect to the missing pages.

> If the vessel arrives at a convenient port before the expiration of the contract, the master/employer may repatriate the seafarer from such port provided the unserved portion of his contract is not more than one (1) month. The seafarer shall be entitled only to his earned wages and earned leave pay *and to his basic wages corresponding to the unserved portion of the contract*, unless within 60 days from disembarkation, the seafarer is rehired at the same rate and position, in which case the seafarer shall be entitled only to his earned wages and earned leave pay. (emphasis added).

The contract further provides:

> If the vessel arrives at a convenient port within a period of three (3) months before the expiration of his contract, the master/employer may repatriate the seafarer from such port provided that the seafarer shall be paid all his earned wages. In addition, the seafarer shall also be paid his leave pay for the entire contract period *plus a termination pay equivalent to one (1) month of his basic pay*, provided, however, that this mode of termination may only be exercised by the master/employer if the original contract period of the seafarer is at least ten (10) months; provided, further, that the conditions for this mode of termination shall not apply to dismissal for cause. (emphasis added).

The contract provides that it is to commence "upon actual departure of the seafarer from the airport or seaport in the point of hire and with a POEA approved contract." As information regarding the dates of departure of any Crew members covered by this contract has not been provided to the Court, the Court is unaware of which, if any, of the contractual provisions actually apply to any Crew member. The Court, however, will analyze the effect of the provisions, if applicable, to any Crew member.

## B.     The Sample Contract for International Shipping Partners

The sample contract of employment used by International Shipping Partners ("ISP") provides for a contract duration of 10 months, beginning on November 7, 2002. The contract provides for a basic wage of $374.00 per month for 44 hours of work each week, Saturday and Sunday compensation of $127.50 per month, holiday compensation of $8.72 per month, fixed overtime of $255.00 per month, vacation compensation of $87.26 per month, a longevity bonus of $100.00 per

3

month, food allowance of $126.00 and a company bonus of $29.00 per month.  The contract provides:

> There will be a probationary period of ninety (90) days during which period the Company or its Agent reserves the right to discharge the Employee with *seven (7) days pay or prior notice*.  During the same period the Employee has the right to terminate the contract with seven (7) day's notice, in which case he has to pay for his own repatriation.  *After the first 90 days, this Contract may be terminated by the Employer for any reason upon payment of two (2) months basic wage*, in lieu of notice . . . (emphasis added).

The contract further provides that if the vessel is "sold, laid up, lost or if the voyage cannot be undertaken or conducted because of war, warlike activities, embargo or blockade," the Company or its Agent may either terminate the contract pursuant to the above provision or transfer the employee to any other vessel managed by the Agent.  The facts provided by the parties do not reveal whether any Crew members subject to this contract, other than the member named in the sample contract, had been employed for more than 90 days when the M/V Regal Empress was arrested on April 18, 2003.  (See Dkt. 5).  The member named in the contract had, based on the date of the exemplar, been employed for over 5 months at the time the vessel was arrested.  The contract is silent as to the remedy for an employee's failure to give 7 days' notice.  Further, the Lienors state that 28 of the 167 seamen were transferred to other vessels.  It is unclear whether any of these seamen were subject to the ISP contract.

## C.     The Sample Contract for Imperial Ocean Services

The sample contract of employment used by Imperial Ocean Services ("IOS") provides for a contract duration of 5 months.  The contract provides for a monthly wage of "US $50.00 + $700.00 monthly average in tips & commssion [sic]" for the duration of the contract.  The contract also provides, "[s]hould it become necessary to adjust the manning of the Vessel, the termination *notice*

shall be no less than (7) days." (emphasis added). The contract is silent as to the remedy for failure to give 7 days' notice.

### D.    The Sample Contract for Regal Cruises

The sample contract of employment used by Regal Cruises provides for a contract duration from December 15, 2002, through June 14, 2003. The contract provides for basic wages of $500.00 per month. The contract provides that "*[n]otice time* for termination of employment on mutual basis (not cause) shall be thirty (30) days." (emphasis added). The contract also provides that within the probationary period of the first 3 months, the employer can discharge the employee with only 7 days' notice. The contract is silent as to the remedy available for late notice or failure to give notice. The contract further provides that if the vessel is "sold, laid up, lost or if the voyage cannot be undertaken or conducted because of war, warlike activities, embargo or blockade," the owner or agent may terminate the contract pursuant to the "notice time for termination provision" or transfer the employee to another vessel.

## II.    ANALYSIS

For the reasons set forth below, and upon consideration of the paucity of evidence provided, the Court finds that the termination pay provided for in the Philippines and the ISP contracts constitutes wages subject to preferred lien status. However, the Court finds that the pure notice provisions provided for in the IOS and Regal Cruises contracts do not give rise to preferred maritime liens for wages.

### A.    Legal Background

As a preliminary matter and overarching any examination of entitlement to preferred lien status for wages is the strong policy that protects seamen's wages. "Seamen . . . are wards of

admiralty whose rights federal courts are duty-bound to jealously protect." Isbrandtsen Marine

Services, Inc. v. M/V Inagua Tania, 93 F.3d 728, 733 (11th Cir. 1996)(quoting Bass v. Phoenix

Seadrill/78, Ltd., 749 F.2d 1154, 1160-61 (5th Cir. 1985)). Accordingly, courts are to scrutinize

carefully any encroachment upon the rights of seamen "because they are unprotected and need

counsel; . . . They are emphatically the wards of the admiralty; . . . They are considered as placed

under the dominion and influence of men, who have naturally acquired a mastery over them: and as

they have little of the foresight and caution belonging to persons trained in other pursuits of life, the

most rigid scrutiny is instituted in the terms of every contract, in which they engage." Id. (quoting

Harden v. Gordon, 11 F.Cas. 480, 485 (C.C.D.Me. 1823) (No. 6047)). Thus, a "super priority" is

afforded seamen's liens for wages and said wage liens "are entitled to be paid as long as a plank of

the ship remains." Id. (citing Key Bank of Puget Sound v. Alaskan Harvester, 738 F. Supp. 398,

405 (W.D. Wash. 1989)(internal citations omitted)).

In evaluating whether certain types of compensation constitute wages and, thus, are entitled

to this preferred lien status, courts have found that additional compensation for hazardous working

conditions provided in response to demands for increased wages are entitled to priority wage lien

status. For example, in The Herbert L. Rawding, 55 F. Supp. 156, 161 (E.D. S.C. 1944), the ship's

Articles, along with the applicable Maritime War Emergency Board definitions, provided that the

crew were entitled to a 100% bonus for transatlantic voyages. The Court found that this "bonus" was

actually additional wages for extra-hazardous transatlantic services. Id. (citing Lakos v. Saliaris (The

Leonidas), 116 F.2d 440 (4th Cir. 1940)). Accordingly, the payment was for services rendered and

the crew had preferred liens for such wages under 46 U.S.C. § 953, now codified at 46 U.S.C. §

31301. See id.

Likewise, in Gayner v. The New Orleans, 54 F. Supp. 25, 28 (N.D. Cal. 1944),[2] the court compared the hazard of non-employment to the hazard of war. There, the anticipated opening of the San Francisco and Golden Gate Bay Bridges caused ferry-boat employees to believe that unemployment was imminent. Id. at 26. Accordingly, labor unions, on behalf of the employees and as a condition of their continued work, entered agreements that provided for "dismissal benefits" consisting of comparable employment or money compensation, both to be proportional to the length of service of the specific employee. Id. On those facts, the court found that the ferry-boat employees had a maritime lien upon the vessel for the dismissal payments. Id. at 29. The court stated that the employees "submitted themselves to the hazard of non-employment" and earned as part of their wages their contracted for dismissal benefits "each day and month and year of service" because their benefits were tied to their length of service. Id. at 28. The court noted that the test for determining whether there is a lien has always been, "has a maritime service been performed?" Id. at 28 (citing Harden, 11 F.Cas. at 480).

In contrast, in a recent Bankruptcy proceeding, In re: Muma Services, Inc., 2005 WL 730353, at *10 (D. Del. March 30, 2005), the court noted that claims for dismissal compensation would not have constituted wages for the purpose of establishing priority liens. There, two Unions requested that the court recognize their claims for dismissal payments as preferred maritime liens for wages. Id. at *7. The workers' collective bargaining agreements provided that upon a sale of the vessel, the ship owner would obtain a written agreement from the transferee that the transferee would, among

---

[2] The Court notes that the Crew filed a Notice of Filing Supplemental Authority (Dkt. 547) on October 31, 2005, attaching this case. The Lienors objected to the filing (Dkt. 548). The Court discovered this decision through its independent research of the issues presented and had incorporated it into its analysis prior to the Crew's filing. Accordingly, the Court denies Lienors' Motion to Strike the filing (Dkt. 548).

other things, retain the workers last employed on the vessel and provide the workers with wages and benefits "for the life of the vessel." Id. at *8. If the ship owner failed to obtain such an agreement, the owner would be liable to the Union in an amount equal to "the total employment costs of a full complement of workers on each involved vessel for a period of three years," which sum would be distributed to the workers. Id. First, the Court determined that the Unions were not factually entitled to any payment because the workers continued to be employed upon the sale of the vessel despite the failure of the owner to obtain a written agreement pursuant to the collective bargaining agreement. Id. In dicta, the court went on to state that even if the workers had not been employed, no preferred maritime lien would exist because, among other reasons, the wages were not calculated by the length of service to the vessel and were not for specific wages but for the "hypothetical cost to the vessel to operate" in the future. Id. at *9.

Finally, in Bender Welding & Machine Co., v. M/V Sovereign Opal, 415 F. Supp. 772, 776-777 (S.D. Ala. 1976), the court found that the seamen's contracts of employment were terminated when they were transferred from one arrested vessel in Alabama to another arrested vessel in Florida. Accordingly, the Court awarded the seamen vacation and severance pay as preferred maritime liens. Id. at 777. While the court did not engage in an analysis of the characterization of the vacation and severance pay as wages, it implicitly characterized the benefits as wages by awarding the seamen priority liens for their recovery. Significantly, the seamen's contracts provided expressly for "four (4) days leave per month *payable upon termination*" and, in the event that the employer dismissed the seamen before expiration of the contract, the contract specified that the seamen were to receive "as the allowance for dismissal one (1) months wages." Id. at 776 (emphasis added).

## B.      Application

In the case *sub judice*, the Crew's claims for termination or severance benefits are based on the noted provisions in the four sample contracts. Because the Crew did not set forth their factual arguments, the Court addresses the present issue under the following assumption: the employers did not give the Crew termination pay and did not provide the various prior notices of termination provided for under the respective contracts. Thus, the Crew claim that they are owed wages for either the termination pay owed or to compensate them for the number of days of notice that their employers failed to provide. Thus, the question before the Court is whether termination pay and/or compensation for the failure to provide adequate termination notice constitute "wages" under 46 U.S.C. § 31301 so that the Crew have priority maritime liens for such payments. Because of their similar character, the Court addresses the rights of the Crew under the Philippines and ISP contracts together and the rights of the Crew governed by the IOS and Regal contracts together.

### 1.      Whether the Crew Members Covered by the Philippines and ISP Contracts are Entitled to Preferred Maritime Liens

With respect to the Philippines and ISP contracts, and on the facts submitted, the Court finds that the termination pay provided for therein constitutes wages subject to preferred lien status. The termination pay provisions provided for in these two contracts, like that provided for in Bender Welding & Machine Co., are specific and quantifiable. Bender Welding & Machine Co., 415 F. Supp. at 777. Under the Philippines contract, the termination pay is either: (1) the amount of unserved wages if the seaman was terminated within one month of the expiration of the contract, provided the seaman is not rehired at the same rate and position within sixty days; or (2) one month's wages if the seaman was terminated within three months of the expiration of the contract, provided that the contract period is at least ten months. Under the ISP contract, the termination pay is either:

(1) seven days' wages if the seaman was terminated during the ninety day probationary period; or

(2) two months basic wages if the seaman was terminated after the ninety day probationary period.

Like the termination pay provided for in Gayner, the termination pay provided for in both contracts is connected to the seamen's length of service provided to the vessel. Gayner, 54 F. Supp. at 26. Under the Philippines contract, the seaman earns the right to one month of termination pay if he has provided services up through the beginning of the last three months of the contract period, provided that he has a qualifying contract of at least 10 months duration. Alternatively, if there remains only one month or less of the seaman's contract at the time of discharge, he has earned the right to his remaining wages, provided that he is not later rehired within the specified sixty day window. Accordingly, the seaman under the ten month contract, as provided for in the sample contract, only earns the right to termination pay after seven months of service to the vessel. Thus, his termination pay is connected to his length of service. Under the ISP contract, the seaman immediately earns the right to seven days' pay (or prior notice) and, after ninety days of service earns the right to two months basic wage as termination pay. As the seaman's right to termination pay accrues with the length of the seaman's service, the pay is earned by the seaman via his service to the vessel. As set forth above, the prerequisite for whether a wage lien exists is whether a service has been performed for the benefit of the vessel. Gayner, 54 F. Supp. at 28. This pay, which is tied directly to the services rendered, constitutes wages for purposes of establishing a preferred maritime lien.

Lienors argue that even if the termination pay constitutes wages, the Crew cannot recover these wages as preferred maritime liens because the pay accrued after the seizure of the M/V Regal Empress. Lienors note that there is a general rule that wages accruing post-seizure of the vessel do

not give rise to a preferred maritime lien for wages. Old Point Fish Co.,109 F.2d 703, 705 (4th Cir. 1940); but see Herbert L. Rawding, 55 F. Supp. at 161 (finding that the seamen's wage lien continued after the arrest of the vessel until the seamen filed their complaint against the ship). Old Point Fish Co. involved the arrest of a fishing vessel where the seamen's claims for wages were for the 60% share of the gross proceeds of a catch that never occurred. 109 F.2d at 705. There, the court found that no maritime lien can be allowed for wages accruing after the libeling of the ship. Id. (citing Collie v. Fergusson, 281 U.S. 52, 55 (1930), for the general proposition that "events subsequent to the seizure do not give rise to liens against a vessel"). The court found that the crew had earned nothing from the voyage up to the time of the seizure. Id. Therefore, the claim for wages was wholly based on the speculative catch that may have occurred in the future had the ship not been libeled. Id. Further, even if the future wages had been for a definite amount, the seamen could not recover for future wages. Id. Accordingly, any such remuneration was not allowable as a maritime lien for wages. Id. at 706. Lienors also cite to Goudinos v. SS Ruth Ann, 193 F. Supp. 524, 525 (D. P.R. 1961). There, the court found that no lien attached to the vessel for wages for services performed after the arrest of the vessel. See also The Philomena, 200 F. 873, 874 (D. Mass. 1912)(allowing the recovery of wages as a priority lien only until the date of arrest of the vessel). All of these cases involved services rendered to the vessel post-arrest or speculative future earnings.

Here, the termination pay provided for in the Philippines and ISP contracts is not for services rendered post-arrest of the vessel. Rather, it is payment that was earned by the seamen through services rendered to the vessel prior to the arrest of the ship. See Gayner, 54 F. Supp. at 28. While the right to demand payment pursuant to these provisions did not occur until the moment of termination, or the moment the ship was arrested, the seamen earned these benefits while performing

services on the vessel prior to its arrest. <u>See</u> <u>Irving Trust Co. v. The Golden Sail</u>, 197 F. Supp. 777.

780 (D.Or. 1961)(stating that the theory behind the prohibition of recovery for wages accruing

subsequent to the arrest of the vessel is that the "act of seizing a ship, pursuant to legal process,

effectively terminates the voyage, and thereby discharges the crew with no *further* claim for wages."

(emphasis added)). Accordingly, the right to termination pay vested at the time the Crew members

had been employed for the requisite period of time. The right to demand payment of the termination

pay accrued at the time the ship was arrested. Thus, here, the wages did not accrue post-arrest.

Accordingly, the rule prohibiting the grant of a preferred maritime lien for wages accruing post-

seizure is not applicable here.

The Court notes that the Lienors argue that forty-six crew members made up the skeleton

crew of the vessel post-arrest and were paid wages as part of the custodial expenses and that twenty-

eight of the crew members were transferred to other vessels. With respect to the crew members who

remained aboard the vessel to preserve the vessel, the fact of their continued work onboard the vessel

subsequent to its arrest does not alter the accrual date of their right to demand termination pay.

These Crew members were paid for their post-arrest work as part of the *custodia legis* expenses, not

by their employer, and their employment contracts were nevertheless terminated at the time of arrest.

If this were not correct, the employers would be obligated to pay into the Court registry that portion

of their employees' salary that was paid for as a *custodia legis* expense.

With respect to the alleged twenty-eight crew members who were transferred to other vessels.

the Court does not have enough information before it to determine whether, with respect to those

Crew members who may have been covered by the Philippines contract, said members were "rehired

at the same rate and position" such that the termination pay provisions would not apply. Further, the

12

Court does not have enough information before it to determine whether, with respect to the Crew members covered by the ISP contract, the arrest of the vessel constituted the vessel being "sold, laid up or lost" such that Crew members who were transferred "to any other vessel managed by the Agent" would not be entitled to termination pay. However, the Crew members who can establish that they were subject to the Philippines or ISP contracts who were not transferred or were transferred, but not pursuant to the transfer provisions noted above, and whose rights to termination pay had vested by virtue of their length of service to the vessel on the date of the arrest of the vessel would be entitled to receive compensation for termination pay as preferred wage liens.

### 2. Whether the Crew Members Covered by the IOS and Regal Cruises Contracts are Entitled to Preferred Maritime Liens

In contrast, the Court finds that the pure notice provisions provided for in the IOS and Regal Cruises contracts do not give rise to preferred maritime liens for wages. These contracts do not provide for termination pay. Rather, they simply provide that the seamen are entitled to certain periods of notice that their employment is being terminated, presumably so they can begin to secure new employment. If the notice is not given, the contracts do not equate the notice requirements with any specific monetary amount. If the notice is given on a timely basis, the Crew is not entitled to additional pay during the notice period beyond the standard pay provided in their contract.

The Crew assumes here that such notice provisions are equivalent to termination pay and necessarily equate to as many days' wages as notice is required. The Crew has not cited to any case law that supports that assumption. Instructive authority suggests that at *most*, any damages awarded to the crew for breach of these notice provisions could be the payment of wages for the number of

days of notice that were not given.[3] See e.g. Mousa v. Lauda Air Luftfahrt, 258 F.Supp.2d 1329, 1346 (S.D. Fla. 2003)(finding no diversity jurisdiction over the plaintiff's breach of contract claim where the plaintiff would be able to recover for breach of the four weeks notice of termination contractual provision, at *most*, his salary and applicable benefits for four weeks); see also Hicks v. Bryan Medical Group Inc., 287 F. Supp. 2d 795, 806 (N.D. OH 2003)(denying the defendant's motion for summary judgment and stating that the plaintiff would, at *most*, be entitled to ninety days' pay for his breach of contract action where his employment agreement provided for ninety days' notice of termination); Griep v. Yamaha Motor Corp. U.S.A., Inc., 120 F. Supp. 2d 1196, 1200 (D. Minn. 2000)(applying Minnesota law). Thus, for example, if a seaman secured a position immediately upon his termination at an equal rate of pay, one could assume that no economic loss would be sustained due to the failure to give this timely notice and thus no payment obligation would arise. See e.g. Perri v. Byrd, 436 So. 2d 359, 361 (Fla. 1st DCA 1983)(reducing an award of damages for breach of two weeks reasonable termination notice by amounts earned by the plaintiff at subsequent employment during those two weeks). This situation is to be compared, for example, to the plain language of the Philippines contract, which provides for a flat rate of termination pay whether the seaman has obtained new employment or not.

Further, by definition, payments for failure to give notice, if owed, are required to be paid not for services rendered to the vessel or employer. That is, the notice provision is intended to

---

[3] The Court notes that two of the submitted sample contracts, the ISP contract and the Regal Cruises contract, contain choice of law provisions that provide that disputes arising under the respective contracts will be adjudicated pursuant to the laws of the vessel's flag state, the Bahamas. Neither the Crew nor the Lienors have briefed this issue. While the laws of the Bahamas may govern contractual disputes under these contracts, general maritime law nevertheless governs the overarching issue of whether a preferred maritime lien exists.

compensate the seamen for being out of work due to the failure to give sufficient timely notice to permit the securing of work. As termination pay is not specifically provided for in the contracts or earned along with the seamen's service to the vessel, these losses do not constitute remuneration for services rendered. Rather, any such damages would be calculated considering the wages the employee would have earned in this notice period minus any wages earned from successful mitigation. For example, to the extent that any seamen pursuant to these two contracts remained on the vessel subsequent to its arrest and were paid by the Court, such seamen's claims brought against an employer for failure to provide notice would be subject to reduction for the amount of pay received for the subsequent services rendered.

Further, the seven days' notice provided for under the IOS contract does not accrue with the seamen's length of service but applies to all seamen regardless of their length of service. While the Regal Cruises contract provides for seven days' notice during the first three months of employment and thirty days' notice thereafter, this does not alter the fact that the crew did not bargain for any specified amount of damages in the event of a breach of the notice requirement. Thus, the Court finds that any damages arising thereunder would, nevertheless, be characterized as damages for breach of the contractual notice provision rather than payment for services rendered onboard the vessel. Accordingly, no preferred lien for wages attaches to any claims under the notice provisions of these two contracts.

This ruling does not leave seamen without any recourse. At least in theory, these seamen have damages claims against their employers. They simply do not have a preferred maritime lien as against the vessel as the notice provisions do not provide for pay in exchange for services rendered. The Court is further aware that this distinction between contractual provisions for actual

15

termination pay and for notice places the ability of the Crew to recover pay for breach of such provisions as preferred maritime liens largely at the whim of the employer in the preparation of the employment contract. To the extent that this is an issue, it is one to be left to the bargaining of the parties or their respective representatives at the time of contract negotiations.

## III.   Conclusion

For the foregoing reasons, the Court finds that the Crew members that are appropriately subject to the noted termination pay provisions (considering length of service and nature of subsequent transfer, if any) of the Philippines and ISP contracts have preferred maritime wage liens for that termination pay. However, the Crew members subject to the Regal Cruises and IOS contracts do not have preferred maritime liens for wages based on the termination notice provisions of the respective contracts. Further, Lienors' Motion to Strike Notice of Filing Supplemental Authority (Dkt. 548) is **DENIED**.

The parties shall file a Joint Stipulation with the Court on or before **Friday, December 16, 2005,** setting forth the names of the individual Crew members subject to the Philippines and ISP contracts that have preferred maritime liens as described above and the amount of those liens. Additionally, the parties shall set forth the resulting value of the remaining liens. The Court will

order the distribution of funds at that time.  Should the parties be unable to so stipulate, the Court

will hold an evidentiary hearing on **Friday, January 20, 2005, at 9:30 a.m.** to resolve any disputed

issues.

      **DONE AND ORDERED** in Tampa, Florida on this 10th day of November, 2005.

                                        MARY S. SCRIVEN
                                        United States Magistrate Judge

Copies to:
Counsel of Record